**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-------------------------------------------------------------- X
JING KONG,                                              :
                                                        :
                                    Plaintiff,          :     Civil Action No. 3:23-cv-03091-MAS-
                                                        :     TJB
                        v.                              :
                                                        :     **FIRST AMENDED COMPLAINT**
JOHNSON & JOHNSON and ETHICON, INC.                     :
                                                        :     **Jury Trial Demanded**
                                    Defendants.         :
                                                        :
-------------------------------------------------------------- X

Plaintiff Jing Kong ("Plaintiff" or "Ms. Kong"), as and for her amended complaint, hereby

alleges through her counsel, Wigdor LLP, against Defendants Johnson & Johnson ("J&J" or the

"Company") and Ethicon, Inc. ("Ethicon") (collectively, "Defendants") as follows:

## PRELIMINARY STATEMENT

1.      As part of its marketing and promotional efforts to retain highly qualified female

employees, J&J boasts on its website about its alleged dedication to supporting female employees

in the workplace and "improving the well-being of mothers":

> 9 Ways Johnson & Johnson Has Supported Women Since 1886
>
> Learn how the world's largest and most broadly based healthcare
> company has been empowering female employees, scientists and
> leaders -- and improving the well-being of mothers around the
> world, since its founding 137 years ago. Then again, this is hardly
> surprising for a company whose first 14 employees included eight
> women -- and whose workforce today is nearly 50% female. Take a
> look at a few important ways Johnson & Johnson has worked to
> advance and celebrate women both inside and outside the company
> for over a century.
>
> **1908.** That's the year Johnson & Johnson hired its first female
> scientist -- no small feat during an era in which fewer than 3% of
> women attended college.[1]

---

[1]    https://www.jnj.com/caring-and-giving/ways-johnson-johnson-has-supported-women.

2.      In countless articles, J&J aggressively markets to the public about the ways in which it is an alleged "trailblazer" for female employees, such as by claiming that "**Johnson & Johnson Is on a Mission to Ignite the Power of Women**."

3.      J&J urges the public, as well as potential and current employees, to read about its recent signing of the "Employee Well-Being & Mental Health Pledge" from the Society for Human Resource Management, which J&J touts as its "commitment to investing in employee health."[2]

4.      It is no secret that maternity leave related benefits are among the most coveted by talented female employees.  Because safeguarding employment and income security during pregnancy and after childbirth are critical measures to the achievement of gender equality at work, it is not surprising that J&J publicly makes the promises it does to attract the best talent.

5.      This makes J&J's breach of such promises even more reprehensible.

6.      On March 1, 2023, J&J fired Ms. Kong.  She started in 2016, and when fired, had the title of Senior Scientist.  Although she had no obligation to do so, Ms. Kong had provided early notification of her pregnancy status to her superiors.  Unlawfully, J&J claims that Ms. Kong's pregnancy had nothing to do with her being selected as the only scientist to be fired from the 17-member team – despite her being the only pregnant employee.

7.      In disbelief, she reasonably demanded to know why she was being terminated.  Her supervisor, Scott Ciarrocca, Director, Advanced Evaluation R&D, said that he could not tell her why.  Her other supervisor, Yijun Lu, assured Ms. Kong that the decision was "not performance based."  Indeed, given her stellar track record at J&J, such a suggestion could not have been made.

---

[2]      https://www.jnj.com/innovation/employee-benefits-that-help-make-johnson-johnson-a-great-company.

8.      Nevertheless, she was cast out even as her superiors knew the hurdles facing Ms. Kong over the ensuing months were massive – and that once potential employers realized that she was pregnant, the odds of her securing new employment were negligible.  Moreover, as the person responsible for providing her family health care, Ms. Kong lost her medical coverage at a critical time in her pregnancy.

9.      As detailed below, J&J knowingly allowed Plaintiff's pregnancy status to compromise her economic and employment security and subjected her to undue discrimination. In a textbook example of pretext, J&J attempted to conceal its discrimination by firing Plaintiff in a recent wave of employee terminations.

10.     If this is what J&J means when it claims to be a "trailblazer for women" and a company that works to "advance and celebrate" female employees, it should publicly clarify that there are massive caveats to such representations.

11.     No female employee should fear revealing her status as pregnant to her employer. Yet, even in 2023, at least at J&J, doing so carries substantial risks.

12.     Ms. Kong commenced this action to hold her former employer accountable for its grievous disregard for the applicable federal and state anti-discrimination laws that were enacted precisely to prevent the harm that Plaintiff continues to experience.

13.     Defendants' actions violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 *et seq.*; the New Jersey Family Leave Act ("NJFLA"), N.J.A.C. § 13:14, *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 e, *et seq.*, ("Title VII") as amended by the Pregnancy Discrimination Act of 1974 ("PDA").

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

16.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), and timely asserted claims under Title VII following the receipt of a Notice of Right to Sue.

17.    Any and all other prerequisites to the filing of this action have been met.

## PARTIES

18.    Plaintiff Jing Kong is a former Senior Scientist at Ethicon and a resident of New Jersey.  At all relevant times, Plaintiff met the definition of "employee" under all applicable statutes.

19.    Defendant Johnson & Johnson is a limited liability company with its principal place of business located at 1 Johnson & Johnson Plaza, New Brunswick, New Jersey.  At all relevant times, J&J met the definition of an "employer" under all applicable statutes.

20.    Defendant Ethicon, Inc. is a privately held wholly owned subsidiary of J&J with its principal place of business located at 1000 US-202, Raritan, New Jersey.  At all relevant times, Ethicon met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.    Ms. Kong's Outstanding Success at J&J

21.    J&J hired Ms. Kong, now 38 years old, in 2016.  As such, it was fully aware of her stellar background, credentials and performance.

22.    She earned a bachelor's degree in chemistry from Nanjing University in May 2008 and a Ph.D. in chemistry from Carnegie Mellon University in May 2014.

23.    As a Ph.D. student and research assistant, Ms. Kong studied the kinetic mechanism of halogen exchange in Atom Transfer Radical Polymerization ("ATRP") by following the time-dependent concentrations of several halide initiators quantitatively in the reaction mixtures.

24.    In 2011, her halogen exchange research was published in Macromolecules journal and has been cited more than 110 times by research scientists all over the world in various peer reviewed research papers and review articles since, demonstrating the significance of her research findings.

25.    After receiving her Ph.D., Ms. Kong taught at both Duquesne University as an adjunct faculty member and Carnegie Mellon University as a visiting lecturer.

26.    She then joined SGS Life Sciences as an Instrumentation Chemist working on the identification and quantitative analysis of potential extractables and leachables ("E&L") from medical devices and pharmaceutical packaging materials.

27.    In 2016, Ms. Kong began working at Aerotek, Inc. as a contract scientist on the J&J Analytical Characterization team and in 2018, Ethicon hired her for a full-time position as a Senior Scientist.  Her exceptional success continued through 2023 as she advanced each year.

28.    In fact, her contributions and success in her role at J&J are too many to list.

29.    Initially Ms. Kong performed analyses using mass spectrometers to provide identification and quantification of E&L compounds supporting biocompatibility assessment.  In addition, Ms. Kong served as a project representative, coordinating both internal and external lab resources to conduct tests needed for research and development ("R&D") projects, including test method development and test method validation.

30.    In July 2019, Ms. Kong conducted Ethicon's first in-house medical device chemical evaluation under the new standards set forth by the European Union Medical Device Regulation ("EU MDR"), which required her to plan the experiment, execute it, analyze the data and draft the report.  Prior to her completion of the first MDR project, her team had not designed or performed chemical characterization in compliance with the new EU MDR standards.

31.    Shortly after, in or around December 2020, Ms. Kong conducted the first MDR study for a challenging medical device made from natural products, marking another milestone in her career because the E&L profile for medical devices made from natural products are less predictable, less controllable and more complicated to analyze.  Ms. Kong completed the analysis of the complex compounds profile and submitted a timely report to J&J's toxicology group, preventing any delay in biocompatibility submission or negative impacts to J&J, such as fines, litigation or product recalls.

32.     Throughout her employment at J&J, Plaintiff reported to Associate Director, Yijun Lu, age 53, and to Ciarrocca, age 64.  She also reported to a male Principal Scientist, Ying Jiang, age 62.

33.     In addition to her assigned work, Plaintiff repeatedly volunteered to take on additional responsibilities and went far beyond what was expected of her.  By way of example only, she volunteered to draft and edit the Advanced Evaluation ("AE") newsletter that required a significant amount of time, including outside of her work hours.  She willingly spent her personal time because Ciarrocca considered the project a priority to boost the visibility of the AE group and highlight its success.  Ms. Kong produced four newsletters annually.

34.     In January 2021, after a former Staff Scientist was transferred from the team, Plaintiff took over his work responsibilities including becoming the project representative for two key R&D projects that this employee previously handled.  To accomplish this, Ms. Kong had to gain a deep understanding of specific expertise and function outside of her specialization in a short amount of time and produce additional work.  Other employees, as well as Lu, understood how much work and effort this endeavor involved.  In fact, Lu told the entire team that Ms. Kong had been "thrown under the bus" in connection with such additional responsibilities.

35.     In addition to working above expectations in connection with her substantive research, Ms. Kong showed great initiative to provide solutions to business needs.  By way of example only, during her project representative work in 2022, Ms. Kong was able to identify a critical unmet need for the AE department when dealing with non-disclosure agreement ("NDA") and procurement procedures.  She contacted the related departments and prepared a training session for the AE representatives for external collaborations.

## II.      Ms. Kong is Selected for Prestigious Bridges Program

36.     Recently, in October 2022, as further proof of Plaintiff's upward trajectory at J&J, she was selected to join the Bridges Program as a patent liaison.

37.     The rotational program offers well-qualified and dedicated employees the opportunity to immerse themselves in other areas of the Company by joining a "hosting department" to gain knowledge and specific skill sets and return to their "home department" (i.e., their original position) upon graduation.

38.     The program is highly competitive.

39.     To apply, she had to obtain approvals by the supervisors involved, be employed at J&J at least three years and have strong annual reviews.

40.     Ms. Kong easily met all the requirements, and Ciarrocca recommended her for the program.   She was accepted and once it started, she worked with R&D scientists and patent attorneys to help review invention ideas and conduct prior art searches.   For example, she attended and hosted meetings with R&D engineers, leaders, and the Intellectual Property ("IP") team to explore patent needs and criteria to perform patent searches.

41.     In short order, Ms. Kong contributed to the IP team's success.   For example, in November 2022, Ms. Kong identified a number of copycat devices of J&J products, which she promptly reported to the in-house patent attorneys.   As a result of Ms. Kong's research, J&J's in-house lawyers successfully seized the infringing devices.

42.     On January 20, 2023, just three months into her new role as a patent liaison and after completing one of her first projects, an IP manager awarded Ms. Kong with an "Inspire Award" for her contribution to a landscape patent search.

43.    During her tenure, Ms. Kong had received numerous other performance-based awards.  In addition to the award in January 2023, Ms. Kong received another six awards based on her excellent performance: Inspire Award (July 2021) (nominated by Ciarrocca); Superhero Award (April 2020) (nominated by Alex Gorsky, former J&J Chairman and CEO); Inspire Award (January 2020) (nominated by a former Senior R&D Engineer); Inspire Award (February 2020) (nominated by a Senior Scientist); Inspire Award (February 2020) (nominated by a Principal R&D Scientist); and an Encore Award (May 2019) (nominated by a Principal R&D Engineer).

44.    By any objective metrics, Ms. Kong was a star performer and contributed substantially to the work of her team.

## III.    Ms. Kong Discloses Her Pregnancy

45.    In December 2022, as part of their regular quarterly meeting, Ms. Kong told Ciarrocca that she was pregnant.  Ciarrocca appeared to be shocked and concerned by the news when he responded by saying that her pregnancy was now "one more responsibility" on top of an "already exhaustive list of responsibilities" she had.  Previously, Ciarrocca had labeled the number of responsibilities she carried as "crazy."

46.    Believing she was doing the "right" thing by telling her boss that she was pregnant far earlier than required, and also excited to share the good news, Ms. Kong tried to continue the meeting undeterred by Ciarrocca's transparent concerns about the burden the pregnancy would create.  Specifically, Plaintiff said she was interested in a second year in the Bridges rotational program.  Ciarrocca's response was not what she had anticipated.  He said that he would have to "look at the budget" to see "if" the department could "fund" a second year.  Before this meeting, Ciarrocca had never mentioned any issues about finding "funding" for a second year.  Rather, at J&J, it was a common practice for employees to complete a second year in the Bridges program.

47.    Meanwhile in January 2023, Lu confirmed that Ms. Kong could extend her Bridges rotation into a second year.  However, when Ms. Kong then told Lu about her pregnancy, Lu was shocked.

48.    Lu's first reaction was to ask Plaintiff if she would be able to "handle" all of her responsibilities at work and at home with two small kids.

49.    Lu did not try to hide the fact that she especially was concerned about what Ms. Kong's childcare arrangements would be after the baby was born – even though her due date was late July 2023, more than 7 months away.

50.    Outrageously, Lu asked her, "Who is going to help you with childcare?" and pressed further by asking, "Are your parents coming to help you?"

51.    While Lu seemed genuinely concerned for Ms. Kong's personal welfare, once Lu knew about the pregnancy, each time she saw Ms. Kong, she asked whether her parents were "here yet."

52.    The repeated questions about her future childcare arrangements revealed what Plaintiff's supervisors were thinking about by late February 2023 in connection with her future work at J&J.  During her employment, Ms. Kong never heard other employees being asked by management about specific childcare arrangements or told that there were concerns about it.

53.    In or around the end of February 2023, when Ms. Kong had to report back to Lu that her parents were not in New Jersey yet, Lu would ask, "When are they coming?"

**IV.    J&J Unlawfully Terminates Ms. Kong**

54.    On March 1, 2023, without any warning, Ciarrocca fired Ms. Kong.

55.    Having worked there since 2016, and receiving only positive praise throughout, Ms. Kong asked Ciarrocca about the basis for her termination.

56.    Ciarrocca refused to answer.  Instead, in sum and substance he said, "I can't tell you why, but we had a lot of factors to consider."  Ciarrocca told Ms. Kong that there was a lot of internal "debate and discussion" but failed to elaborate.

57.    In shock, Ms. Kong expressed her concern that losing her job meant a loss of health insurance when her family needed it the most, especially for the remainder of her pregnancy and the delivery.  Ciarrocca apologized about the future lack of medical insurance, of paramount importance to any pregnant woman.

58.    A week later, multiple coworkers told Ms. Kong that Lu announced to the team that Ms. Kong had been fired.  They told her how shocked they were upon hearing the announcement and offered Ms. Kong support.  The coworkers said that Lu reported that the decision to fire Ms. Kong was made by Ciarrocca and management.

59.    The pretext is blatant.  J&J began messaging in February 2023 that it would be laying off employees in some divisions as part of a purported reduction of force ("RIF").

60.    At the time of her termination, Ms. Kong was entitled to receive up to 19 weeks of paid maternity leave.

61.    Clearly, J&J rationalized that paying a pregnant employee her full annual salary, despite upcoming leave was a business expense it wanted to avoid – notwithstanding federal and state laws mandating that doing so is unlawful.

62.    Based on her pregnancy status, J&J compromised Plaintiff's economic and employment security – something that it publicly promises it does not do.

63.    Further, J&J jeopardized her right to ongoing medical treatment and care by her existing doctors that she reasonably believed she was entitled to for the remaining five months of

her pregnancy.  Rather than providing economic security to a dedicated female scientist, J&J has caused her financial and emotional stress.

64.     Ms. Kong told her supervisors about her pregnancy months before she was under any obligation to do so, because she, mistakenly, believed that her early disclosure would benefit her team members and J&J by providing as much advance notice of her leave as possible.  Her loyalty and good faith cost her a job she loved.

65.     No other employee from Ms. Kong's team was fired as part of the reduction in force.  Ms. Kong was the only member of her team who was pregnant.

66.     Even a cursory look at the other employees on this 17-member team shows that any lawful "business decision" would have resulted in another employee (someone who was not pregnant) being let go.  For example, at least 6 of the 9 men on team earned more money than Plaintiff.  Further, at least 4 of these 9 men were recent hires, including 2 men who had worked at J&J less than a year.  In addition, 2 other male employees started in 2021.

67.     However, J&J management understood that none of the 9 men on the team would need to take 19 weeks of maternity leave in 2023.

68.     Of the remaining 7 team members, all female, 4 of them had substantially less work experience than Ms. Kong, and far less tenure at J&J.  Yet J&J opted to retain these employees and terminate the sole employee who had provided her notice to take maternity leave beginning in July.

69.     Confusingly, J&J's "story" about how Ms. Kong was selected for termination has shifted – a fact pattern suggestive of pretext.  First, Ms. Kong was told the decision was not based on her performance.  Then, she was told it was a "management decision," without elaboration.  Thereafter, J&J messaged that a calculation based on a 3-year history of ranking in annual reviews

was involved in the decision.  In addition to the shifting narrative about why the only pregnant scientist was chosen for termination, more pretext is suggested regarding the third excuse offered because 7 employees out of the 17-person team (forty percent) had worked there less than 3 years, and therefore did not have a 3-year history of ranked performance.

70.     Disgustingly, had J&J actually taken the time to read Ms. Kong's reviews and compare them with her peers, it would be impossible to miss the first two full sentences of her review for year 2020 – the hardest period of the Covid-19 lockdown, which reads:

> "Jing had a very challenging year due to Covid-19.  **The lack of child care hindered her ability to be onsite to perform her job."**

71.     Not only is the above representation false, because Ms. Kong worked physically on site in the lab on average 2-3 days a week throughout 2020, but at least 2 employees on the 17-member team failed to physically work at the office even a single day a week.  Their complete absence physically on site was such that months later when they eventually came to the office and tried to enter the building, their passes had expired, and thus they could not get in.

72.     Upon information and belief, these employees' reasons for failure to be onsite had nothing to do with childcare.  Importantly, even if reasons were offered up these employees, such physical absences were not noted or weighed as factors in their yearend 2020 performance reviews that impacted their rankings.

73.     Worse, as part of Lu's belief that Ms. Kong's alleged childcare issues were impacting her performance as compared to her peers during Covid-19, Lu also told Ms. Kong to "find a nanny."

74.     In the past, Ms. Kong's managers responsible for completing her annual performance reviews, had admitted to Ms. Kong that they did not understand the rating criteria they had to use, which often changed year to year.  These managers also told Ms. Kong that even

though the rating system was confusing and unclear, they "had" to make sure the misunderstood rating criteria resulted in a curve.

75. Such a system of "forced ranking" has been attributed to discrimination against female employees, who as compared to their male peers, are systemically undervalued and ranked lower, resulting in less promotions and lower pay rates. It is common knowledge that "forced ranking," also called "rank and yank," has been widely criticized because research has shown how the system inherently institutionalizes bias and devalues groups of employees, such as women. Upon information and belief, J&J knows that its forced ranking system has been accused of systematically undermining the advancement of its female employees, yet it continues to rely upon it, and based on at least one of its "explanations" for her firing, considered Ms. Kong's forced rank 2020 yearend review when terminating her.

76. Regardless, under no set of circumstances was J&J entitled to "rate performance" for Ms. Kong or rank her on a curve based on "childcare situations." Yet, that is what happened to Ms. Kong during Covid-19.

77. Unquestionably, Ms. Kong's recent announcement of her pregnancy was subjected to her managers' blatant bias.

78. Notably, in contrast to what was reported in her review, in 2020, the first year of the Covid-19 lockdown, Ms. Kong received the Superhero Award from Gorsky, the former J&J Chairman and CEO, for her "unwavering dedication" of **onsite services** throughout the global pandemic.

79. Outrageously, J&J opted to retain another employee on the 17-person team over Ms. Kong despite this employee's willingness to take a proposed severance package and exit his

employment.  Upon information and belief, this employee was paid substantially more than Ms. Kong.

80.    Rather than continuing to employ Ms. Kong, a dedicated, experienced and talented employee, J&J opted to target her for termination as the sole pregnant employee.

**FIRST CAUSE OF ACTION**
**(Interference and Retaliation under the FMLA)**
*Against Defendants J&J and Ethicon*

81.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

82.    By the actions described above, among others, Defendants J&J and Ethicon interfered with Plaintiff's rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*., and retaliated against Plaintiff on the basis of her decision to exercise her rights under the FMLA.

83.    As a direct and proximate result of Defendants unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

84.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

85.    Defendants unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the NJLAD)
### *Against Defendants J&J and Ethicon*

86.     Plaintiff hereby repeats and re-alleges each and every allegation in all the preceding paragraphs as if fully set forth herein.

87.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex and pregnancy in violation of the New Jersey Law Against Discrimination N.J.S.A. § 10:5-1 *et seq.*, by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

88.     As a direct and proximate result of Defendants' unlawful discriminatory conduct committed by Defendants in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

89.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

90.     Defendants committed these unlawful acts with willful negligence, recklessness or a conscious disregard of Plaintiff's rights under the NJLAD, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NJLAD)
### *Against Defendants J&J and Ethicon*

91.     Plaintiff hereby repeats and re-alleges each and every allegation in all the preceding paragraphs as if fully set forth herein.

92.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her sex and pregnancy in violation of the NJLAD by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

93.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

94.     Defendants committed these unlawful acts with willful negligence, recklessness or a conscious disregard of Plaintiff's rights under the NJLAD, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the NJFLA)
### *Against Defendants J&J and Ethicon*

95.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

96.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the New Jersey Family Leave Act, N.J.A.C. § 13:14, *et seq.*  Similarly, at all times relevant herein, Defendants J&J and Ethicon were and are "employers" within the meaning of the NJFLA.

97.     By the actions described above, among others, Defendants J&J and Ethicon discriminated against Plaintiff on the basis of her sex and pregnancy in violation of the NJFLA.

98.     As a direct and proximate result of Defendants unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

99.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NJFLA)**
***Against Defendants J&J and Ethicon***

100.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

101.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the NJFLA.  Similarly, at all times relevant herein, Defendants J&J and Ethicon were and are "employers" within the meaning of the NJFLA.

102.     By the actions described above, among others, Defendants J&J and Ethicon retaliated against Plaintiff for exercising her rights under the NJFLA.

103.     As a direct and proximate result of Defendants unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

104.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of Title VII as amended by the PDA)
### *Against Defendants J&J and Ethicon*

105.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

106.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of Title VII.  Similarly, at all times relevant herein, Defendants J&J and Ethicon were and are "employers" within the meaning of Title VII.

107.    By the actions described above, among others, Defendants J&J and Ethicon discriminated against Plaintiff on the basis of her pregnancy in violation of Title VII as amended by the PDA by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and terminating her employment.

108.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

109.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

110.    Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff under Title VII as amended by the PDA for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII as amended by the PDA)
### *Against Defendants J&J and Ethicon*

111.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of Title VII.  Similarly, at all times relevant herein, Defendants J&J and Ethicon were and are "employers" within the meaning of Title VII.

113.    By the actions described above, among others, Defendants J&J and Ethicon retaliated against Plaintiff for requesting maternity leave by terminating her employment.

114.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

115.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

116.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff under Title VII as amended by the PDA for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enters judgment in her favor and against the Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate federal and state laws;

B.    An award of economic damages;

C.      An award of compensatory damages;

D.      An award of punitive damages;

E.      An award of liquidated damages;

F.      Prejudgment interest on all amounts due;

G.      An award of reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 12, 2023
   New York, New York       Respectfully Submitted,

                **WIGDOR, LLP**

                Jeanne M. Christensen
                Kassandra Vazquez

                85 Fifth Avenue
                New York, New York 10003
                Telephone:  (212) 257-6800
                Facsimile:   (212) 257-6845
                jchristensen@wigdorlaw.com
                kvazquez@wigdorlaw.com

                *Counsel for Plaintiff*